and E.C., Counsel, whenever you're ready, you may proceed. Daniel J. Gruninger for the Respondent Appellant, Jared Cook. May it please the Court, Opposing Counsel, as with most cases involving guardianship, guardianship is one of the key and most important periods of time immediately after the death of the custodial parent, and what the non-custodial parent does to demonstrate that he was willing and able to make and carry out the day-to-day child care decisions with respect to the minor children. This case involved two minor children, and their ages were six and five at the time, seven and six at the time of the hearing. Initially, immediately after the death of the custodial parent, which was Brittany, the father received a phone call from Deidre, which was Brittany's natural biological mother. Now, this is important, and it's important because she was initially asked to make that phone call to notify by Carol Bonhoff, the step-grandmother in the case, and after Carol asks Deidre to make that call, Jared, the father, calls Carol, which verifies that Deidre had Jared Cook's information. She knew where he lived, and she had his phone number. This is important because it wasn't put into the petition for guardianship that was filed, signed the next day, the day after Brittany's death, on May 6, 2015, and entered by the court as an order for temporary guardianship on May 11. And it was done ex parte, without giving any notice to the natural father, and without giving him an opportunity to appear, and, of course, noticing an opportunity being important to establish his rights as a natural parent, and to argue immediately from the get-go that the grandparents did not have standing in this particular case. Now, what happened immediately after the death of Brittany, in addition to the next day they go in, the grandparents go into their attorney's office and sign a petition for guardianship, is the grandparents then took a copy of an authorization to the natural grandmother, Deidre, the same person, into her hotel room and had her sign it. They had enough presence of mind to know that they didn't want Deidre also asking for guardianship at the time they were asking for guardianship. And that's important to note that that defeats any argument that they have about, well, we just didn't think about the natural father's rights in this particular case. And this is all critical, because once that guardianship order is signed by the judge on an ex parte basis on May 11, it then makes it extremely difficult for the natural father to demonstrate that he's willing and able to make and carry out the day-to-day care decisions. At that point in time, they're in control. They have not only possession of the children, but an order giving them a code of authority to prevent the natural father from just showing up and picking up the kids. The time frame goes like this. Brittany dies on May 5th. Deidre, Jared, and Carol all talk the same day. The next day they go in and sign the petition. On May 8th they file the petition for guardianship for each of the children, and on May 11th that order is granted. Now, I point this out because this is part of the overall interference that the grandparents have done. Despite the protestations that they've done all they can to ensure that the natural father has a relationship with the children, this is just one of the many steps that they took to interfere with that relationship. Aside from signing the petition for guardianship the day after, they also then went to Mexico about two weeks after the order was granted. And not at no moment did they think for one minute, even though they already had an order for guardianship giving them code of authority, not for one minute did they think about picking up the phone and offering the natural father an opportunity to have the children for the week and a half that they were going to be in Mexico. They didn't take the children with them. They left them here. Who did the children stay with? I don't know that I talked to Adam. The children stayed with the natural grandfather, Lindell Bonhoeff's son and daughter-in-law during this time period. Okay. So, but they didn't know... And Eric, is that the son? Yeah, Eric and I believe that's who they stayed with during this time period. Now, the next thing I want to point out is, it wasn't just that they left his address off the guardianship petition paperwork. And I think it's important to note, to quote specifically from what was said to the court in order to get that order for temporary guardianship. On page R4, the attorney for the Bonhoeff's specifically stated, at this time we've not been able to find an address, Your Honor, for the children's father. And then later on, the question to the father on page R8, you do not have the current address of the children's father, Jared Cook. Answer, no. Nobody ever asks the natural grandfather, Lindell, or he never testified or ever offered up any information that he could have easily gotten that address, that he easily could have gotten that phone number. In a five-minute phone call to Deidre, he could have had that information. He could have let the father know that he was going in for a petition for guardianship on May 11th, and they chose to do none of that. What did the father do between the day of death and May 11th to find his children? He filed a petition on May 21st. My question was between May 5th and May 11th. What interest did he show for his children? On May 5th, he specifically told both parties in Memphis, both Carol and Jared, he specifically told her, I'm coming to get the children. And then on May 6th, after they filed the petition, on May 11th, she got the order giving her guardianship. He did not want to come out for the funeral on the 8th. He did not want to come out for the funeral because he didn't want to interfere with their ability to grieve. He didn't want to create a scene at the funeral. And he didn't have the money, quite frankly, because at this point in time, this is May of 2015, and I provided in exhibit response, exhibit N, I provided a list of his employment for all the various periods. He was working at Chili's, restaurant work, minimum wage. He didn't have the money, quite frankly. So that was the other reason why he didn't come out for the funeral. But after he found out about the order entered on May 11th, he then went back to Pat Dennis, who had been his attorney, and that's important too, which I'll get to in just a minute, and asked her to file a motion to vacate this order for guardianship, which was filed on May 21st. Ten days after the order for guardianship was granted, he sought to vacate it, and he sought to have immediate possession of the children. Now, backtracking, before the death of Brittany, he had hired Pat Dennis to represent him for purposes of setting up a visitation schedule. He had not been granted one in the judgment of dissolution that was entered in February of 2014, and so even though he tried to work with Brittany throughout the next year, it came to a head when he was unable to do that. He hires Pat Dennis in January of 2015 for the purpose of setting up a visitation schedule for himself. This is important because not only is he demonstrating that he's interested in seeing his children, but then on the eve of before Brittany's death, coincidentally, Pat Dennis mailed out the petition for visitation to set up a visitation schedule. It was filed by the court in Effingham on exactly the same day, May 11th, the date that the temporary order for guardianship was granted. And that was not referenced by anybody in the order for temporary guardianship, or it doesn't appear in the record. So the bottom line is, with respect to demonstrating an interest with regard to his children, he started that process actually in January of 2015, and it came to a head just before Brittany's death, literally on the eve of her death, May 4th, 2015. Now, with regard to additional things that the Bonehoffs did during this period of time, in Christmas of 2015, for the testimony of Carol Bonehoff, she specifically stated, I'm not going to let the children go out to California. I don't know him. He's the father of the children. What is there for her to not know with respect to the fact that he helped raise the children the first two years of Ezra's life and the first year plus of Malachi's life, and yet she is not willing to let the children go out to California. Despite their allegations that they did everything they could, she specifically refused to let the children go cross-country because she didn't know him. And then there's the issue of alcohol abuse, oppression, counseling. Those were allegations that were made, and if you read the testimony of Deidre, she does say that they drank a lot. Both Jared and Brittany, when they were together, drank a lot, but it never around to the point where they were unable to take care of their kids, and there was a period of time leading up to right before their separation when Jared and Brittany had gotten their act together, so she said. After the separation, the court found that there was repeated alcohol abuse, depression without treatment or counseling, sporadic employment, financial irresponsibility, and residential stability. Those were findings made by the trial court here, right? Yes, and those all appear in the docket entry order of that day, January 26th. With regard to each of those, on the issue of alcohol abuse without any alcohol counseling or treatment, it's interesting to note, first of all, that the grandparents didn't have any reservations about Brittany who was doing the same thing with Jared and didn't lift a figure to take guardianship away from her at any point in time, but now find Jared inadequate in his parenting abilities with regard to that. The other half of it is that may have been during a period of time, per Deidre's testimony, leading up to a short period of about eight months before the separation between Brittany and Jared, but no one had any evidence of any alcohol abuse since that, and that had been in early 2012. With regard to depression and an emotional breakdown, that was an allegation that was made. There's no testimony to support that in the record. There is no evidence that he was ever diagnosed with any kind of psychosis or depression that would justify a finding that he needed treatment with regard to that. On employment and financial irresponsibility, the trial judge focused on the fact that, well, he's only working at a job making a minimal amount of money in food service. Well, that's not the standard for purposes of deciding whether or not we're going to take someone's children away. I don't think the law provides, and I don't think anyone wants the law to provide, that if you don't make enough money, we're going to take your children away. We're not taking the children away, are we really? Well, as far as... I mean, he has the right, if he wants, to visit them, but I don't see in the record any real effort that he's made to visit during a time, especially when he knows that legal proceedings are going on. Well, with regard to the various time periods, and I quoted this in summary fashion in my brief, from June of 2012 to July of 2013, he had two broken necks and was going through rehabilitation. From July of 2013 through December of 2013, he actually did go visit the kids. He saved up the money working at a minimum wage restaurant service type job and got his visitation in November of 2013. In December of 2013, he served with a petition for dissolution that he's got to defend here in Illinois, even though he's residing in California, which was entered as a judgment in February of 2014. From February of 2014 through January of 2015, he's working with Brittany to not only is he talking to her and maintaining phone contact about what's going on with the kids, but he's trying to work out a visitation schedule with her because he wasn't awarded one in the judgment. In January of 2015, that's when he hires Pat Dennis to set up a visitation schedule, and he counted on Pat Dennis to get that for him, and she filed a petition literally the evening before. Now, he also counted on... Let's talk about from January 2016 to June of 2017, when all these proceedings are going on. Between January of 2016... How many times did he visit with his kids? He visited with the children... One was during the hearing, so that doesn't count, right? So one is he's here for the hearing. He's here for the hearing in January of 2016. He saw them in November of 2015 before that. He saw them in October of 2016. So January to October he doesn't see his children? Correct. He doesn't come visit them? Does he send them cards or letters or birthdays or whatever? Yes. Respondents exhibit W details, all of the things that he sent to them. There was one thing that was left off of W, and that is an additional gift card over December, Christmas of 2015. And it has a list of each payment that he made and all of the cards, letters, and presents that he sent during these various periods of time between December of 2012 and up until the hearing in June of 2017. And he did have four weeks over the summer of 2017. So he did have the levels of contact that he had were commensurate with the fact that he's living in California, she's in Brittany before her death, is either in Illinois or Texas or Mississippi for various periods of time, although no one can tell you exactly where she was at any given point in time. He's got to come up with the money. He's got to find Brittany. He's got to get her to agree to some visitation because he doesn't have an order. That's what he hired Pat Dunn for. You didn't finish your sentence. And he's got to make all that happen when they're not even sure, the people who claim to be closest to Brittany, are not even sure where she is at any given time or the children. Thank you, counsel. Counsel? May it please the Court? Counsel? My name is Kirsten Osteen, and I represent Lyndall and Carol Bonhoff, the petitioners in this case and recently appointed guardians. If I could touch on a question quickly that was asked by Your Honor. Between the evidentiary hearing on standing in January of 2016, Jared didn't see his children for nine months. He came in October of 2016. The Children's Social Security funds were used to reimburse his plane tickets so that he could come. And in November of 2016, my clients, on their own dime, took the kids out to California to see him. Then after that, he didn't see them for six months until the next evidentiary hearing. And a lot of emphasis is put on the temporary guardianship petition in opposing counsel's argument. And when petitioning this Court or any court for guardianship, there are roadmaps, thankfully, that have been set out by NRAAW, NRAAGG, NRAARLS,  And throughout that case law, do not proceed to a hearing on the merits. What does that mean? Don't jump to best interest. That loses the constitutional protection for the parent, right? You're just comparing who's better. You can't do that. You've got to get over the standing hurdle. That's the protection. And balancing the protection for the parent is the protection for the minor, which the Court has inherent authority over to protect the minor. And in this situation, my clients had not seen Mr. Cook for over three years. Carol had met him twice, ever. Linda had met him once, ever. And he had seen the children one time since May of 2012, and that was in November. Wasn't that partly because Brittany was estranged from her father for a period of time? No, that came up that in high school she had moved down with her mom for a while. But that was well before she met Jared. Okay. In November of 2013, he saw the kids for two days in Texas, and he admitted before that he did not tell Brittany where he lived. He didn't tell her where he worked. So this extensive effort that he's making to do whatever he can to be with his children, he didn't even let her know where he lived or worked. A month after that, he was served with dissolution papers, yes. But then he didn't see them for another two years. Two years. In November of 2013, Ezra was four and Malachi was three. The next time he saw them, Ezra was six and Malachi was five. Enter the litigation. It doesn't get any better. What about the petition he filed? You have to admit that shows some motivation for him. For visitation? That is correct. Yes, and before the court on the 11th, that was not in the dissolution file. The dissolution file was pulled to try to find the last, you could tell somewhat from the conversation where the court had said, here's where he was served and our position was, we're not trying to get around standing. We're not trying to jump to best interest. These kids were just kind of walking down the highway after a terrible accident, picked up from the emergency room. Grandparents want to make sure somebody can speak for them. You do not need possession to file for guardianship. You know, a lot of accusations could be made, but the testimony has been consistent that before Ezra went to Texas, they just wanted to know if somebody could speak for the kids. And nothing was tried to pull. Jared was sent notice on May 14th. The next time he called, that's when there was a frame of mind to say, where do you live? What's your address? We've got a PO box. We sent him notice. After three days of testimony in January of 2016 and four days of testimony in June of 2017, I cannot with any confidence tell you where I believe he lived. And this is also after discovery on the day Brittany died. But going back immediately after Brittany's death, do you dispute that when Carol spoke to Deidre, Deidre told Carol that she had spoken with Jared, and so presumably she would know how to get in touch with him? Yes. I believe the testimony was Deidre said, I'll contact Jared. Now, Jared did call that day. So then obviously Carol would know that Deidre would know how to get a hold of him? That is correct. And she did not ask her for his phone number? No, she did not. Okay. And again, with the frame of mind of what was going on, I mean it could be said that this was all an elaborate scheme to keep Jared from his children for more time when he hadn't seen them in so long. But that notice was immediately sent out May 14th. Okay. But can I ask you one more question related to that? Does she dispute, Carol, that Jared said he wanted to come out and get the children and she said something to the faculty about that, I don't think so, or something like that? There has been a couple of different versions of a conversation that lasted approximately five minutes on that day where a lot was happening. And Carol's testimony was something about, eventually I want the boys to be with me, they need their dad. And her response, we're going to have to talk about it. You know, she just said I was scrambled, you know, people were all over my house and we've been up since four and that was the testimony. And I think it's important to look at the facts because now we have the hindsight of why didn't you check caller ID, right? But it wasn't happening at that time. Jared filed his petition on May 21st, I believe, to vacate the order. Never set for hearing. Throughout discovery after the other grandma got involved for a while and then was out, we realized he's texting her, it's part of the record, May 24th, 2015. I'm canceling their court date. I'm going to get my own 19 days after the mother died. They're preventing me from it. You know, the court's description of the father's reaction and approach in this case as a replevant action in paragraph 25 of the order, C-518, is an adequate description and I think it's very insightful for someone who got to evaluate the credibility of the witnesses stating that, you know, these aren't chattel, these are children. And the back and forth and some of the accusations, I think, continue to show that he showed up for battle, okay, but not for the children. And the testimony, he testified himself, he was never denied a request for visitation. Never. Not through his attorney, not through his mother who usually had to arrange it, and not through counsel. He testified to that several times. So you could pull out these little parts of testimony where Carol says, in the summer of 2015, I just really didn't think it was my place. What does that mean? She can't unilaterally set up a visitation with someone who rarely called and didn't ask. And so I think that's important. And also, things like the school records. That came out in the first hearing. He'd been added to, I'm sorry, the medical records. He'd been added to the medical records. Share whatever you like. Here we go again, June of 2017. It's their denial. It's their refusal. And that simply is inaccurate. It later came out, yeah, Carol, text him at the doctor's office, let him know Malachi had strep throat. But that did come out. And that she had communicated with him. And so some of the record is difficult to get through because there is so many accusations. But keeping all of that in mind, I think Jared's testimony that he had no reason to speak to his opponents in litigation. This is May. This is May 2015. He had reasons to speak to his opponents in litigation. And to now say, I know nothing about my children because you would not tell me about them. He didn't want to talk to them. His effort to set up a telephone visitation, the record's accurately cited. It's 92. But his effort was to ask the kids who were five and six, when should I call? Because he wouldn't talk to the grandparents. And really, they barely knew each other at all. Like I said, one meeting, two meetings. And so I think it's important to look at those things in that context. And also, he did get the hearing on standing. It was separate. The evidence was separate from the best interest hearing. The court, counsel involved were very cautious and aware of those rules. You can't muddle those things. Because it's impossible to differentiate. And so he did receive separate hearings on those. And the evidence supported the court's ruling. It was a very detailed ruling. This is the manifest way of the evidence standard when we're looking at findings of fact. And in big part, I think what made an impact on the court is, you know, in 16 months between the hearings, you only saw your children twice, and you didn't give any reason for it. Now, one of those times, my clients took them to California. He complained it wasn't long enough. But no good reasons for why this lack of interest continued. It had already been present. And I think those things are important. Also, with regard to how the Bonhoeffs treated him, my clients treated him. His father testified at the second hearing, Ed Cook. He was welcomed into their home, first time they ever met him. The kids were happy to see him. They hadn't seen him for years and years. They hadn't seen Jared for three years before he came to testify on his behalf. And they were welcoming, so welcoming to him. He felt immediately comfortable. They felt comfortable. Same testimony from his mother. His father testified that he had to chastise his son for his behavior. I did not raise you to treat people like that, just based on the limited observation he saw with them. And so the cooperation there, that's difficult. But it's not only a – it's not that the goal here was to keep Jared away. That has never been the goal. And I think that is clear through the testimony is they are so protective of these children's feelings. They don't bring attention when their dad doesn't call, even though sometimes he doesn't call for five, six weeks. They don't do that. They want him to feel loved. And every time he comes, he testified, those kids are happy to see him. They're excited to see him. Now, in part, that is due to the preparation that my clients do to encourage and foster that relationship. They don't want them to suffer any more loss. They told Jared to stay at their house, come when you want, organize trips, that kind of thing. If I'm repeating myself, I apologize. The court also noted that when my clients went out in November of 2016, everybody thought Jared still lived with his sister. That's where the visitation took place. He had moved twice. Nobody knew about it. He had this duplex, this place of his own. Kids go out there for the first time. My clients are out there. He refuses to introduce them to his family. That's okay. You know, it's time with the kids, even though it might help break the ice. And, oh, by the way, no one knows he has his own place. So this continuation of not cooperating and not sharing information about himself, I think, had an impact on the court's ruling. It's pretty difficult to get... Perhaps that's why the court found him invasive. Yes. Yes. Yeah, I had several words for that. On both hearings. And that's true, and that made trying the case difficult. As far as the Christmas of 2015, there was a petition pending, if I mention this, by Dieter Gettner to his party. She wanted visitation. She noticed it up for hearing. It's not. Carol refused to let them go to California. Lyndall refused. If you look at the docket entry at C-1011, there's an agreement reached. Jared Cetroni was in court about that visitation. And I believe that he couldn't even make the visitation because he had to work or something. And certainly that's the case in the next year. I'm interested in this visitation where they used the children's money to reimburse him for travel. That was a prerequisite, yes, for him to come. That money is not for parents to travel to see their children, is it? I don't believe so, which is why I sought court approval before entering into that order. But, yes, that was a demand repeatedly. Made by? Mr. Crook. Jared. Yes. The father. Yes. He wasn't going to spend his own money to see his kids? No. It had also been proposed that my clients could just take care of it, but they're not wealthy people. They're hardworking, good people, but no. How old are your clients? Lyndall, I believe, is 59. Carol is right around. You may answer. 59 and I believe 57. About that age, okay. This doesn't have to be precise. Any other questions? I don't believe so. Thank you. Thank you very much. Thank you. Johnson. Mr. Groninger, what do you say about your client losing his children's money for travel? That was part of the order and I wasn't in the case at that time. I have no idea what the background. You weren't in it? I wasn't in it. I came into this, the tail end of this, right before June of 2017. So I don't have the history. So you weren't even there for the standing hearing? I was not. Okay. Thank you. With regard to a couple of points that I want to make. First of all, Carol admitted on her own that she had done nothing to end getting the Skype prepared. It had been loaded onto the boy's tablets and she had failed to make that happen, even though he had sent the tablets over with the Skype loaded on them in February of 2016. She hadn't been able to make that happen even by then. A couple of other things she admitted. She said with regard to why she hadn't sent records, just didn't, just didn't. School records, they were sent once, and that was through Discovery. Even though they've had the children for in excess of two years, she'd only sent them once. No doctor records except for the one occasion. Dentist records, eye doctor, counseling records, and one-time photos. And that, too, was the only occasion on that. Extracurricular activities, T-ball and swimming, she never sent those either. Just didn't. That was her answer. And then lastly and most importantly with respect to what they had done or not done, I should say, is not once during the two years that they had had the children up until the time of the June 2017 hearing, not once had they picked up the phone and told Jared about something that was going on in the children's lives that they would be privy to that obviously he wouldn't unless he got a phone call. And that never happened. How many times did he pick up the phone and call them to find out what was going on? He made a number of phone calls that are all detailed in Carol's log on a regular basis. So all of those are. I do think I saw that exhibit, actually. Yeah, there's a long log with respect to that. I want to talk about the standard with respect to all of this. And there's one case that stands out in defining what it means to be able to make and carry out the day-to-day care decisions. And that's Henry RLS, of course, handed down by the Illinois Supreme Court. And able is defined in that case as possessed of the needed powers or resources to accomplish the objective rather than something akin to intelligence, knowledge, skill, or competence. And I think that is critical in this case because what I think that case is pointing out is that you have to have the minimum of needed powers and resources to accomplish the objective. I don't think the Supreme Court is indicating that it has to be the maximum because if you made it the maximum possessed of needed powers and resources to accomplish the objective, then the courts would get into saying to parents, you didn't spend enough time helping your children with their homework. You didn't feed them peas instead of too much McDonald's, on and on and on. It would be dictating the daily lives of the parent to justify saying that they have not, they are not willing and able to make and carry out the day-to-day care decisions. And I think that's important in this particular case because NRA RLS lays out a standard that Mr. Cook was able to fulfill based on the distance, the sheer distance of him living in California, working at a minimum wage job up until April of 2016, and the ability to exercise physical visitation as opposed to other things. And he did those other things, cards, letters, and presents, which I made a list of and introduced as an exhibit. And I also introduced another exhibit showing what all his various jobs were. And all of his jobs were minimum wage up until April of 2016 when he got into car sales. And for the first time, he was able to get a little more than minimum wage so he'd have some money to be able to make the trip from California back here to Illinois or wherever. So I think that's important for the court to take a look at NRA RLS and expound upon it to show that the trial judge shouldn't be getting into how, the details of what makes an okay parent versus a good parent versus a great parent. Because if it's only great parents that we're going to say only great parents are able to, make and carry out the day-to-day care decisions, I think that sets the bar far too high in order to justify allowing a non-parent to have guardianship as opposed to a parent to have custody. And I think that's exactly what needs to focus on here, especially in conjunction with some of the other cases that speak to this issue. For example, the state of Johnson, which I quoted in my brief, deals with willing and able at the time of hearing. And that's what we're talking about. Finally, by June of 2017, he had had a job sufficiently in place. Thank you, counsel. Thank you. We appreciate the briefs and arguments of counsel. We'll take the case under advisement. Thank you.